PEOPLE ex rel. POTTER et al. v. BOARD OF RAILROAD COM'RS et al.

(Supreme Court, Appellate Division, Third Department. January 8, 1908.)

1. RAILROADS—NECESSITY—COMMISSIONERS' FINDING.

Where a proposed railroad, only 12 miles in length, to be built as an independent road, would serve only a small locality, would probably not earn running expenses, and would be financially disabled from the start, a finding by the board of railroad commissioners that it was necessary and convenient was erroneous.

2. EMINENT DOMAIN—PUBLIC USE.

Where there was no public necessity for the construction of a proposed railroad, the railroad company was not entitled to condemn land for a right of way; promoters being unauthorized to take property for a right of way for their own use.

Certiorari by the people, on the relation of Elizabeth L. Potter and others, to review proceedings by the railroad commissioners certifying as to the necessity and conveyance of the Cooperstown & Northern Railway Company under Railroad Law, Laws 1890, p. 1082, c. 565, § 89, as amended by Laws 1892, p. 1395, c. 676, etc. Order annulled.

Argued before SMITH, P. J., and CHESTER, KELLOGG, COCHRANE, and SEWELL, JJ.

Arnold & Cooke (Lynn J. Arnold, of counsel), for relators.

Tilley Blakley, for respondents.

JOHN M. KELLOGG, J. The proposed road is to run from the village of Cooperstown to the village of Springfield Center, upon the westerly side of Otsego Lake. It is to be a standard-gauge steam railway about 12 miles in length, and is to be built as an independent road. The village of Cooperstown has about 2,500 inhabitants, the village of Springfield Center about 300 inhabitants, the town of Springfield, including Springfield Center, about 1,800 inhabitants. The principal necessity for the road is supposed to be the furnishing of railroad facilities to Springfield Center and the town of Springfield. Springfield Center is now 6 miles distant from the Delaware, Lackawanna & Western Railway station and the Oneonta & Mohawk Valley Railway at Richfield Springs, and about 7½ miles distant from the Delaware & Hudson Railroad station at Cherry Valley, and about 10 miles distant from the Delaware & Hudson station at Cooperstown. The freight rate at Cherry Valley is the Albany rate, the freight rate at Richfield Springs is the Utica rate, the freight rate at Cooperstown is the Albany rate plus the charge from Oneonta to Cooperstown, the Delaware & Hudson Company giving no through rate to Cooperstown, and the present rate from Cooperstown to Oneonta for car load lots is 4 cents per 100 pounds and from 5 to 15 cents per 100 pounds for broken car lots. It now costs 50 cents per ton less to ship hay from Cherry Valley than from Cooperstown. The town of Springfield extends in an easterly and westerly direction. The easterly part of the town is nearer to Cherry Valley than to Springfield Center, and the westerly part nearer to Richfield Springs than to Springfield Center, and it is evident that, if the proposed railway is built, it will still be cheaper and nearer for the farmers in the easterly part of the town of Springfield to take their produce to Cherry Valley, and for those in the western part of the town to take theirs to Richfield Springs. Thus the

principal advantage of the road will be to the village of Springfield Center and to the population of about 900 included within a radius of about two miles from that village.

Various witnesses were sworn as to the probable amount of milk, hay, and other products to be shipped from the town of Springfield, assuming that the entire products of the town will go over the proposed railroad, which we have seen is not probable. The passenger travel seems to be very light, and it is at present conducted by a stage coach running once a day from Springfield Center to Cooperstown. In the summer there is a line of boats upon Otsego Lake which accommodates in part the summer travel. The stock of the proposed road is $240,000. It is estimated that it will cost $254,000 to build the road, exclusive of equipment and the right of way. The equipment is estimated at $100,000, so that the road at the beginning, if the stock represents actual cash, will be $114,000 in debt, besides the cost of the right of way. It is evident that the road could not be bonded for that amount, unless it is fairly demonstrated that it could pay running expenses and interest on the bonds at least. From the record it is extremely probable that the road cannot pay running expenses. It therefore would apparently be a financial cripple from the start, and there is no public necessity for the construction of a road which cannot maintain itself and which must inevitably be bankrupt from the beginning. Such a road in this territory cannot be a public convenience or necessity.

It is unnecessary to go into detail as to the estimated business and the probabilities that the company may do such business, and the probable cost of operation and maintenance. The evidence as to the probable business and shipments is evidently mere guesswork and greatly exaggerated. A mere statement of the locality of the proposed road and the manner in which that locality is now served by the railroads clearly indicates that there is no necessity for this road.

The question here is not whether the railroad commission would have authority to permit a railroad to be constructed upon a right of way owned by the promoters of the road. The promoters do not own the right of way, but are seeking to take the property of the relators for their own use, which cannot be done. A public use only will authorize the taking of the property of the relators against their will. There is in this case no public necessity which justifies or requires that the owners be deprived of their property.

The order appealed from should be annulled, with $50 costs and disbursements to be paid by the respondent railway company. All concur, except SEWELL, J., not voting.